UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

───────────────────────────────

VANESSA E. CARBONELL,        )
ROBERTO A. WHATTS OSORIO,   )
ELBA Y. COLON NERY,        )
BILLY NIEVES HERNANDEZ,    )
NELIDA ALVAREZ FEBUS,     )
LINDA DUMONT GUZMAN,      )
SANDRA QUINONES PINTO,    )
YOMARYS ORTIZ GONZALEZ,   )
JANET CRUZ BERRIOS,       )
CARMEN BERLINGERI PABON,  )
MERAB ORTIZ RIVERA,       )
                             )
         Plaintiffs,  )
                        )     CIVIL ACTION
      v.               )     NO. 22-01236-WGY
                        )
ANTONIO LOPEZ-FIGUEROA,   )
UNION OF ORGANIZED CIVILIAN )
EMPLOYEES, JOJANIE MULERO   )
ANDINO,                   )
                        )
         Defendants.  )
                        )

───────────────────────────────

YOUNG, D.J.[1]                        September 19, 2024

**MEMORANDUM AND ORDER**

## I. INTRODUCTION

In the absence of a compelling reason provided by the government, it is unconstitutional for a public employer to pay a discretionary monetary health care benefit to members of a public sector union (with exclusive bargaining rights over union

---

[1] Of the District of Massachusetts, sitting by designation.

and eligible non-union members alike) and decline to pay that same monetary health care benefit to eligible non-members.

As this Court has written, "exclusive union representation echoes the representative structures of American democracy both in its assets and its imperfections, fostering a majoritarianism tempered by constraints of fair representation but which inescapably yields a dissenting minority. . . . Non-union dissenters may feel aggrieved that their policy preferences do not prevail; like a voter whose disfavored political party holds office, however, they are neither required to join the representative union nor perceived as endorsing its conduct." Peltz-Steele v. UMass Fac. Fed'n, Loc. 1895 Am. Fed'n of Tchrs., AFL-CIO, 626 F. Supp. 3d 230, 241 (D. Mass. 2022), aff'd sub nom. Peltz-Steele v. UMass Fac. Fed'n, 60 F.4th 1 (1st Cir. 2023), cert. denied sub nom. Peltz-Steele v. UMass Fac. Fed'n, Loc. 1895 Am. Fed'n of Tchrs., AFL-CIO, 143 S. Ct. 2614 (2023).

In this action, the plaintiffs are a putative class of civilian employees ("Employees")[2] of the Puerto Rico Police Bureau ("the Police Bureau" or "the Bureau") that disassociated with Defendant Union of Organized Civilian Employees ("the

---

[2] The Employees consist of plaintiffs Vanessa E. Carbonell, Roberto A. Whatts Osorio, Elba Y. Colón Nery, Billy Nieves Hernández, Nélida Álvarez Febus, Linda Dumont Guzmán, Sandra Quiñones Pinto, Yomarys Ortiz González, Carmen Berlingeri Pabón, Merab Ortiz Rivera, and Janet Cruz Berrios.

Union") after the Supreme Court's decision in <u>Janus</u> v. <u>American Fed'n of State, Cnty., & Mun. Emps., Council 31</u>, 585 U.S. 878 (2018).[3]  The Union and Public Employer[4] honored the Employees' disassociation requests, but as a result, the Public Employer terminated a monthly $25 health benefit previously paid by the Public Employer under the Collective Bargaining Agreement to union and non-union members alike.

The Employees move for summary judgment, claiming that the termination of this benefit is retaliation and a violation of their right of non-association under the First Amendment.  The Public Employer argues that the Employees are arguing an extension of <u>Janus</u> and cross-move for summary judgment.

For the reasons stated below, the Employees' motion for summary judgment is <u>ALLOWED</u> as for declaratory and prospective injunctive relief, and the Public Employer's Motion for Summary Judgment is <u>DENIED</u>.

---

[3]  In <u>Janus</u>, the Supreme Court "overruled its decades-old decision in <u>Abood</u> v. <u>Detroit Board of Education</u>, 431 U.S. 209 (1977), and held that such 'agency fee' arrangements violate the First Amendment of the United States Constitution by compelling the speech and association of non-union governmental employees." <u>Doughty</u> v. <u>State Emps.' Ass'n of N.H.</u>, SEIU Loc. 1984, CTW, CLC, 981 F.3d 128, 130 (1st Cir. 2020), <u>cert. denied</u>, 141 S. Ct. 2760 (2021).

[4] Antonio López Figueroa ("López"), and the Bureau's Human Resources Director Jojanie Mulero Andino ("Mulero") are official capacity defendants and collectively referred to here as "the Public Employer".

## II.  BACKGROUND

On August 18, 2022, the Employees filed an Amended Complaint, Am. Compl., ECF No. 22, in this putative class action, seeking monetary damages, declaratory relief, and injunctive relief against the Union, the Commissioner of the Puerto Rico Police Bureau,[5] and Public Employer for violation of their First Amendment right to be free of association with the Union.

On March 23, 2023, the Court dismissed monetary damages claims against the Public Employer.  Order, ECF No. 87.  All that remain are claims for declaratory and prospective injunctive relief claims as to the Public Employer.[6]  Id.  The claims against the Union remain.

On January 19, 2024, the Employees moved for summary judgment against the Public Employer, but not the Union; the Public Employer responded to the motion and filed an untimely

---

[5] According to the Amended Complaint, the Police Bureau "is not being sued as a separate entity, Defendants López and Mulero are being sued in their official capacities as PRPB Commissioner and PRPB Human Resources Director, respectively, with the purpose of seeking injunctive relief against PRPB through these officers for the unconstitutional practices described [t]herein."  Am. Compl. 2 n.1.

[6] The Employees' counsel confirmed at the April 16, 2024, hearing that they seek only declaratory and prospective injunctive relief against the Public Employer.

cross-motion for summary judgment.  See Mot. Summ. J., ECF No. 107; Mem. Supp. Mot. Summ. J., ECF No. 107-1 ("Employees' Mem."); Opp'n Pls.'s Mot Summ. J. ("Opp'n") & Defs.' Mot. Summ. J. ("Public Employer's Mem."), ECF No. 134; Reply ("Reply"), ECF No. 138.  The Court declined to strike the untimely motion. Elec. Order, ECF No. 141.

On April 16, 2024, the Court held a hearing on the cross-motions for summary judgment.  The Court offered to proceed on a case stated basis; however, the parties did not agree and therefore the Court proceeded with oral argument on the motions for summary judgment.

### III. UNDISPUTED FACTS[7]

The Employees' Statement of Undisputed Facts is undisputed by the Public Employer.  Opp'n 4 ("[The Public Employer] acknowledge[s] as undisputed the statement of uncontested material facts submitted by [the Employees] in their motion for summary judgment").

Michelle Moure Torres ("Moure") is the Acting Human Resources Manager of the Puerto Rico Police Bureau.  SUF ¶ 1. As Acting Human Resources Manager, Moure oversees the Divisions of Recruitment, Leave, Appointments and Changes, Classification

---

[7] The facts and headings are taken nearly verbatim from the Statement of Undisputed Facts ("SUF"), ECF No. 107-2, and quotations are omitted for readability.

and Wages, Personnel Training, Personnel Evaluation, and Psychology and Social Work.  SUF ¶ 2.

Moure's immediate predecessor in the position of Human Resources Manager is Jojanie Mulero ("Mulero").  Id. ¶ 3. Mulero's immediate predecessor in the position of Human Resources Manager was Zoraida Sánchez González ("Sánchez").  Id. ¶ 4.  Mulero has served as Associate Commissioner of General Services for the Puerto Rico Police Bureau since February 1, 2023.  Id. ¶ 5.

Mulero directed the Puerto Rico Police Bureau's Human Resources office from March 8, 2021, through January 31, 2023. Id. ¶ 6.  The Director of the Human Resources office of the Puerto Rico Police Bureau reports directly to Mulero daily.  Id. ¶ 7.

Antonio López Figueroa ("López") has served as Commissioner of the Puerto Rico Police Bureau since January 2, 2021.  Id. ¶ 8.

Jorge Méndez Cotto ("Méndez") has been the president of the Union of Organized Civilian Employees since December 10, 2006. Id. ¶ 9.

Magaly Rodriguez Cortes ("Rodriguez") is the Payroll Division Supervisor of the Puerto Rico Police Bureau.  Id. ¶ 10. Mariluz Nieves Fuentes's ("Nieves Fuentes") job title is Payroll Officer.  Id. ¶ 11.

[6]

Maritza Alvarado ("Alvarado") was Payroll Director for the Puerto Rico Police Bureau from 2004 until December 31, 2019. Id. ¶ 12.

Brenda Castro ("Castro") has worked as a Supervisor in the Leave Division of the Police Bureau since February 28, 2020. Id. ¶ 13.

The Police Bureau's Leave Office oversees employee leave and attendance. SUF ¶ 14. Examples of employee leave include vacation, sickness, maternity, paternity, and military leave. Id. ¶ 15.

Vannesa E. Carbonell ("Carbonell") works at the Headquarters of the Puerto Rico Police Bureau in San Juan, Puerto Rico. Id. ¶ 16. Carbonell has worked as a civilian employee for the Puerto Rico Police Bureau since 1992. Id. ¶ 17. Carbonell's job title is Office Worker II. Id. ¶ 18.

Roberto A. Whatts Osorio ("Whatts") works at the Headquarters of the Puerto Rico Police Bureau in San Juan, Puerto Rico. Id. ¶ 19. Whatts has worked as a civilian employee for the Puerto Rico Police Bureau since 1985. Id. ¶ 20. Whatts's job title is Office Worker II. Id. ¶ 21.

Elba Y. Colón Nery ("Colón") works at the main headquarters of the Puerto Rico Police Bureau in San Juan. SUF ¶ 22. Colón has worked as a civilian employee for the Puerto Rico Police

Bureau since 1991.  Id. ¶ 23.  Colón's job title is Office
Worker II.  Id. ¶ 24.

Nieves Hernández works at the main headquarters of the
Puerto Rico Police Bureau in San Juan.  Id. ¶ 25.  Nieves
Hernández has worked as a civilian employee for the Puerto Rico
Police Bureau since 1994.  Id. ¶ 26.  Nieves Hernández's job
title is Office Worker II.  Id. ¶ 27.

Nélida Álvarez Febus ("Álvarez") works at the Headquarters
of the Police Bureau in San Juan, Puerto Rico.  Id. ¶ 28.
Álvarez has worked as a civilian employee for the Puerto Rico
Police Bureau since 1994.  Id. ¶ 29.  Álvarez's job title is
Electronic Information Equipment Operator II.  Id. ¶ 30.

Linda Dumont Guzmán ("Dumont") works at the Headquarters of
the Police Bureau in San Juan, Puerto Rico.  Id. ¶ 31.  Dumont
has worked as a civilian employee for the Puerto Rico Police
Bureau since 1992.  Id. ¶ 32.  Dumont's job title is Licensing
Officer.  Id. ¶ 33.

Sandra Quiñones Pinto ("Quiñones") works at the
Headquarters of the Police Bureau in San Juan, Puerto Rico.  Id.
¶ 34.  Quiñones has worked as a civilian employee for the Police
Bureau since 1991.  Id. ¶ 35.  Quiñones's job title is Payroll
Officer I.  Id. ¶ 36.

Yomarys Ortiz González ("Ortiz González") works at the
Headquarters of the Police Bureau in San Juan, Puerto Rico.  Id.

¶ 37.  Ortiz González has worked as a civilian employee for the Police Bureau since 1995.  Id. ¶ 38.  Ortiz González's job title is Office Systems Assistant II.  Id. ¶ 39.

Carmen Berlingeri Pabón ("Berlingeri") works at the Headquarters of the Police Bureau in San Juan.  Id. ¶ 40. Berlingeri has worked as a civilian employee for the Police Bureau since 1992.  Id. ¶ 41.  Berlingeri's job title is Office Systems Assistant II.  Id. ¶ 42.

Merab Ortiz Rivera ("Ortiz Rivera") works at the Police Bureau Command Center in Guayama, Puerto Rico.  Id. ¶ 43.  Ortiz Rivera has worked as a civilian employee for the Police Bureau since 1996.  Id. ¶ 44.  Ortiz Rivera's job title is Office Systems Assistant II.  Id. ¶ 45.

Janet Cruz Berrios ("Cruz") works at the Police Bureau Command Center in Guayama, Puerto Rico.  Id. ¶ 46.  Cruz has worked as a civilian employee for the Police Bureau since 1995. Id. ¶ 47.  Cruz's job title is Office Systems Assistant II. Id. ¶ 48.

As a Payroll Division Supervisor, Rodriguez supervises a group of about fifteen people, including Nieves Fuentes.  Id. ¶ 49.  Rodriguez performs data entry duties with respect to the deductions and contributions of employees, as well as employee affiliations and disaffiliations with the Union of Organized

Civilian Employees.  Id. ¶ 50.  Nieves Fuentes' work involves health deductions and contributions for employees.  Id. ¶ 52.

Francheska Barjam is the current Director of the Payroll Division.  Id. ¶ 51.

Nancy E. Torres Osorio's ("Torres") job title is Payroll Officer.  Id. ¶ 53.  As a Payroll Officer, Torres inputs the information necessary for the payroll system to make deductions, employer health insurance contributions, and she makes necessary adjustments to employee salaries.  Id. ¶ 54.  Torres personally hands a monthly check for union dues to Méndez.  Id. ¶ 55. Torres personally hands a list of employee names, positions, and dues paid by each employee to the Union, to Méndez once a month. Id. ¶ 56.

Sánchez was Human Resources Manager for the Police Bureau from May 2018 to March 2020.  Id. ¶ 57.

Jahaira Pérez Román preceded Sánchez as Human Resources Manager.  Id. ¶ 58.

Sánchez began her current position of Executive Officer at the Department of Public Safety in January 2023.  Id. ¶ 59. Sánchez worked for the Police Bureau from 1991 to 2020.  Id. ¶ 60.

Sandra Clemente preceded Mulero as Assistant Superintendent in Management Services for the Police Bureau.  Id. ¶ 61.

**A.    The Collective Bargaining Agreement.**

Article 2 Section 1 of the current collective bargaining agreement between the Union and the Police Bureau, ("CBA"), ECF No. 107-27, Ex. 22-1) reads:

> The Public Service Work Relations Commission pursuant to certification number 19 dated November 13, 2000, acknowledged and recognizes EMPLEADOS CIVILES ORGANIZADOS, AN AFFILIATE TO THE FEDERACION PUERTORRIQUEÑA DE POLICIAS LOCAL 4000 OF THE INTERNATIONAL UNION OF POLICE ASSOCIATIONS AFL-CIO, **as the exclusive representative of employees that fall under the Appropriate Bargaining Unit made up of civilian employees of the Puerto Rico Police Agency for conducting negotiations with the Agency for the establishment of salaries, fringe benefits and other work conditions that affect personnel that is part of the Appropriate Unit.**

Id. ¶ 62 (emphasis added).

Article 2 Section 2 of the current collective bargaining agreement between the Union and the Puerto Rico Police Bureau reads:

> If during the term of life of the present bargaining agreement any legislation to amend the Law of Public Service Work Relations Law or of any regulations thereto were enacted and approved or if any other legislation were to affect the certification and acknowledgment of the Union as the Exclusive Representative, the Agency will not unilaterally alter salaries, fringe benefits and other work conditions set forth under this agreement for personnel of the Appropriate Bargaining Unit.

Id. ¶ 63.

Article 2 Section 4 of the current collective bargaining agreement between the Union and the Puerto Rico Police Bureau reads:

> The Agency likewise pledges to recognize the Union as the Exclusive Representative in the forementioned (sic) matters, for such classifications, job positions or employment categories that may be added in the future to the Appropriate Bargaining Unit, pursuant to the procedures that have been established in the Bargaining Agreement.  Exclusions to this provision include those classifications, job positions or employment categories that require clearance, or are, by nature, transitory, irregular, freelance per diem, or confidential.

Id. ¶ 64.

Article 11 Section 1 of the current collective bargaining agreement between the Union and the Puerto Rico Police Bureau reads:

> The parties agree as to the following employer contributions, for members of the Appropriate Unit.
>
> 1. $25.00 monthly effective as of January 1, 2014
> 2. $25.00 monthly effective as of July 1, 2014
> 3. $25.00 monthly effective as of July 1, 2015

Id. ¶ 65.

Article 11 Section 2 of the current collective bargaining agreement between the Union and the Puerto Rico Police Bureau reads:

> The budget request shall include specific line items along with the total sum of money necessary to fulfill the scheduled monetary contribution increases to the employer contributions to the health insurance plan. The Police will send the budget request to the Office of Budget and Management.  The Office of Budget and

Management is responsible for structuring the final
number to the budget.  Once submitted to the
Legislative Assembly the Agency pledges to go before
the legislature to justify the budget and the employer
contribution increases as submitted.

Id. ¶ 66.

Article 11 Section 3 of the CBA reads:

If the Commonwealth of Puerto Rico were to grant to
all public employees an increase that is greater than
the current employer contribution to the Healthcare
Insurance Plan referenced in this article, then the
employer contribution will be matched assigning the
remaining amount for the completion of such an
increase.

Id. ¶ 67.

Article 13 Section 1 of the CBA reads:

The Appropriate Unit represented by the Union,
Empleados Civiles Organizados (E.C.O.), shall be the
Unit of Civilian Employees, as certified by the Public
Service Work Relations Commission, by means of
certification number 19, issued on November 13, 2000.
This is all subordinate to the issuance of a
corresponding Public Service Appellate Commission
determination following the presentation of a recourse
requesting clarification on the Appropriate Unit, an
action that was filed by Puerto Rico Police, taking
into consideration the newly approved classification
plan of June 24, 2002, by Puerto Rico Police and the
Central Office of Labor Consulting and Human Resource
Administration, that went into effect on January 1,
2002.

Id. ¶ 68.

Article 13 Section 2 of the CBA reads:

Whenever the Agency determines to fill open job
positions that the Commonwealth of Puerto Rico Office
of Management and Budget has authorized within the
Appropriate Unit, these will be covered by civilian
personnel.  The Agency will give the Union a list of

people and covered positions within the Appropriate
Unit, every six (6) months following the signature of
this Agreement.

Id. ¶ 69.

Article 14 Section 2 of the CBA reads:

The Agency will report in writing to the Union within
a term of time not to exceed thirty (30) working days
all personnel actions taken that affect employees that
are part of the Appropriate Unit such as: regular
appointments, promotions, transfers, demotions and
unpaid leaves of absence.

Id. ¶ 70.

Article 14 Section 3 of the CBA reads:

The Agency will report to the Union within a term not
to exceed thirty (30) working days the name of every
employee whose appointment has changed from a regular
status and whose job position is contemplated within
the Appropriate Unit.

Id. ¶ 71.

Article 15 Section 1 of the CBA reads:

An affiliate is an employee of whose position falls
within the Appropriate Unit, holds membership in the
Syndicate, pays full dues and receives all
organizational benefits.

Id. ¶ 72.

Article 15 Section 2 of the current collective bargaining

agreement between the Union and the Police Bureau reads:

All employees will be members of the Union as long as
they hold a job position belonging to the Appropriate
Unit within the Agency, starting from the date when
the current Agreement is ratified by secret vote by
the majority of the employees belonging to the
Appropriate Unit that participated in the vote and
were so certified by means of a sworn statement coming

from the Secretary of the Union, subject to applicable
legislation.  The Union will respect the right of
employees to not affiliate.

Id. ¶ 73.

Article 39 Section 1 of the CBA reads:

During the life of this present Agreement the Agency
pledges to withhold from the salary of each employee
that is a member of the Union the due and any
variations to the same that the Union may certify
pursuant to its Rules and Regulations and any
provisions of law that may apply.  The Union will let
the Agency know what the amount of the due is.

Id. ¶ 74.

Article 81 Section 1 of the CBA reads:

Electrical and Plumbing Systems.  The Auxiliary
Superintendency for Administrative Services will
immediately verify the breakdown and its magnitude at
the affected physical installation.  The employee or
Union Representative shall provide timely notice by
telephone to the Labor Relations Office letting it
know about the existence of any breakdown at the
specified physical installation.  Whenever the
breakdown involves Areas, Districts, Precincts, Units
or Divisions notice is to be given to the Director.
The Labor Relations Office will take down the time of
the call for the reason for the breakdown or damage
report.  The Office of Relations must in turn give
notice to the Auxiliary Superintendency for
Administrative Services about the breakdown or damage
and make a note of the time that such notice was
given.  If the breakdown were to last more than four
(4) hours the Auxiliary Superintendency for
Administrative Services, or whenever the matter
involves Areas, Districts, Precincts, Units, and
Divisions, the Director will tell the union employees
that are covered by this Agreement that they are
relieved from work, with no prejudice to their leaves
of absence.  If the breakdown were to last a whole
workday from one day to the next, the employees are to
report to the facility for relocation to another work
unit or area that may be operating under acceptably

safe, secure, and sanitary conditions.  The Agency is
to provide the necessary conditions to ensure that
essential services remain in place without
interruption.  Any employee that does not report to
work will be charged accordingly pursuant to the
supervisor's recommendation.  Should there be no
facilities available for relocation they will be given
the day off.  Facilities with alternative electrical
and plumbing systems are exempted whenever such
facilities remain at an acceptable level of operation.
Understanding this means that conditions at the
workplace remain safe, secure and sanitary.  The
parties acknowledge the current condition of sanitary
conditions within the different work areas and that
there is a desire to have sanitary facilities for the
exclusive use of Agency employees.  Nevertheless, the
parties acknowledge the difficulties that exist due to
different reasons, for which the situation cannot be
resolved in any specific manner.  Because of the
preceding, the Agency will allow the Union to review
the different work areas and present alternatives or
proposals to the Agency which will not be bound by any
of these.  The Agency pledges to review these and take
them into account for the purpose of resolving the
matter in the future.

Id. ¶ 75.

    Article 81 Section 2 of the CBA reads:

Air Conditioning Systems.  The Agency will conduct all
relevant efforts to fix and provide maintenance to all
air conditioning systems wherever these may exist for
the purpose of keeping them operational.  Whenever the
air conditioning system breaks down during regular
working hour shifts, and the facilities lack any
alternative system such as fans or windows with
adequate ventilation, the employees are to [(sic)]
relieved  from work during the first four (4) hours
following the breakdown; providing that this time that
is not worked will not be discounted.  The Agency in
this situation shall have the opportunity to assess
whether the breakdown will likely continue for the
remainder of the workday or if, to the contrary, it
will be repaired.  Should the breakdown be one that
will last for long, in excess of 24 hours, then a
request will be made to the Security Committee to

conduct an evaluation of the affected facility and
determine the magnitude or gravity of work conditions,
taking into account OSHA regulations for cold and
heat.  (Temperature is not to exceed 86 degrees).
Additionally, it will determine if a special schedule
is put into effect, which would involve a reduced
workday and/or the establishment of special times for
signing in and out of work, provided essential
services are not interrupted, and salaries and leaves
are not impaired.  The recommendation made by the
Health and Safety and Security Committee shall be
notified to the Agency and the Union.  If it does
become necessary to set up a special schedule, the
Agency will decide the plan for the workday that would
be established, subject to prevailing work conditions,
until such a time when repairs are completed.

Id. ¶ 76.

Méndez is involved in bargaining with the Puerto Rico

Police Bureau as part of his job duties as president of the

Union.  Id. ¶ 77.  Méndez appoints members of the Union's

negotiating committee that bargains with the Puerto Rico Police

Bureau.  Id. ¶ 78.

The last time Méndez appointed members of a bargaining

committee to negotiate on the Union's behalf was in 2013.  Id. ¶

79.  The collective bargaining agreement negotiated in 2013 is

still in effect today.  Id. ¶ 80.  Méndez believes that the

Union is the exclusive representative only of the civilian

employees affiliated with the Union.  Id. ¶ 81.  Méndez was

involved in negotiating the portions of the collective

bargaining agreement granting the additional employer health

insurance contribution.  Id. ¶ 82.

[17]

B.    **The Puerto Rico Police Bureau Withholds Additional Employer Health Insurance Contribution Because Employees Disaffiliated with the Union.**

Carbonell was affiliated with the Union of Organized Civilian Employees on June 27, 2018, when the U.S. Supreme Court issued its ruling in Janus.  Id. ¶ 83.  As an affiliate of the Union and a member of the bargaining unit exclusively represented by the Union, Carbonell received the additional $25 monthly employer health insurance contribution.  Id. ¶ 84.

On July 18, 2018, after learning about the U.S. Supreme Court's ruling in Janus, Carbonell communicated to the Puerto Rico Police Bureau's Human Resources Office her desire to disaffiliate with the Union by submitting a disaffiliation form and requesting the cessation of dues deductions from her wages. Id. ¶ 85.  As soon as Carbonell's union dues deductions ceased, the Puerto Rico Police Bureau also reduced the amount of her employer health insurance contribution by $25 a month.  Id. ¶ 86.

On March 31, 2022, Carbonell sent Mulero an email, demanding that the additional employer contribution of $25 per month be restored as a benefit of employment with the Puerto Rico Police Bureau.  Id. ¶ 87.  Mulero never responded to Carbonell's email.  Id. ¶ 88.  To this day, Carbonell receives

[18]

the base employer contribution of $100 per month instead of the $125 she received prior to her disaffiliation.  Id. ¶ 89.

Whatts was affiliated with the Union of Organized Civilian Employees on June 27, 2018, when the U.S. Supreme Court issued its ruling in Janus.  Id. ¶ 90.  As an affiliate of the Union and a member of the bargaining unit exclusively represented by the Union, Whatts received the additional $25 monthly employer health insurance contribution.  Id. ¶ 91.

On July 18, 2018, after learning about the Supreme Court's ruling in Janus, Whatts communicated to the Puerto Rico Police Bureau's Human Resources Office his desire to disaffiliate with the Union by submitting a disaffiliation form and requesting the cessation of dues deductions from her wages.  Id. ¶ 92.

As soon as Whatts's union dues deductions ceased, the Puerto Rico Police Bureau also reduced the amount of his employer health insurance contribution by $25 a month.  Id. ¶ 93.  To this day, Whatts receives the base employer contribution of $100 per month instead of the $125 he received prior to his disaffiliation.  Id. ¶ 94.

Colón was affiliated with the Union of Organized Civilian Employees on June 27, 2018, when the Supreme Court issued its ruling in Janus.  Id. ¶ 95.  As an affiliate of the Union and a member of the bargaining unit exclusively represented by the

Union, Colón received the additional $25 monthly employer health
insurance contribution.  Id. ¶ 96.

In or around November or December 2020, Colón communicated
to the Puerto Rico Police Bureau's Human Resources Office her
desire to disaffiliate with the Union, submitting a
disaffiliation form and requesting the cessation of dues
deductions from her wages.  Id. ¶ 97.  As soon as Colón's union
dues deductions ceased, the Puerto Rico Police Bureau also
reduced the amount of her employer health insurance contribution
by $25 a month.  Id. ¶ 98.  To this day, Colón receives the base
employer contribution of $100 per month instead of the $125 she
received prior to her disaffiliation.  Id. ¶ 99.

Nieves Hernández was never a member of the Union of
Organized Civilian Employees.  Id. ¶ 100.  As an affiliate of
the Union and a member of the bargaining unit exclusively
represented by the Union, Nieves Hernández received the
additional $25 monthly employer health insurance contribution.
Id. ¶ 101.  The Puerto Rico Police Bureau extracted nonmember
forced fees from Nieves Hernández's wages and remitted them to
the Union until on or about June 27, 2018, when the Supreme
Court issued its ruling in Janus.  Id. ¶ 102.  As a forced fee
payer and member of the bargaining unit exclusively represented
by the Union, Nieves Hernández received the additional $25

monthly employer contribution to help pay for health insurance costs.  Id. ¶ 103.

At some point after June 27, 2018, Nieves Hernández communicated to the Police Bureau's Human Resources Office his desire to terminate Union dues deductions from his wages and declined affiliation with the Union.  Id. ¶ 104.  The Police Bureau and the Union complied with Nieves Hernández's request, resulting in the cessation of nonmember forced fees deductions from his wages.  Id. ¶ 105.  As soon as Nieves Hernández's dues deductions ceased, the Puerto Rico Police Bureau reduced his employer health insurance contribution by $25 a month.  Id. ¶ 106.  To this day, Nieves Hernández receives the base employer contribution of $100 per month instead of the $125 he received prior to his request to have deductions stopped.  Id. ¶ 107.

Álvarez was affiliated with the Union on June 27, 2018, when the Supreme Court issued its ruling in Janus.  ID. ¶ 108.  As an affiliate of the Union and a member of the bargaining unit exclusively represented by the Union, Álvarez received the additional $25 monthly employer health insurance contribution.  Id. ¶ 109.  On December 14, 2020, Álvarez communicated to the Police Bureau's Human Resources Office her desire to disaffiliate from the Union, submitting a disaffiliation form and requesting the cessation of dues deductions from her wages.  Id. ¶ 110.  As soon as Álvarez's union dues deductions ceased,

[21]

the Police Bureau also reduced the amount of her employer health
insurance contribution by $25 a month.  Id. ¶ 111.  To this day,
Álvarez receives the base employer contribution of $100 per
month instead of the $125 she received prior to her
disaffiliation.  Id. ¶ 112.

Dumont was an affiliate of the Union on June 27, 2018, when
the Supreme Court issued its ruling in Janus.  Id. ¶ 113.  As an
affiliate of the Union and a member of the bargaining unit
exclusively represented by the Union, Dumont received the
additional $25 monthly employer contribution to help pay for
health insurance costs.  Id. ¶ 114.  In July 2018, after
learning about the Supreme Court's ruling in Janus, Dumont
communicated to the Police Bureau's Human Resources Office her
desire to disaffiliate with the Union, submitting a
disaffiliation form and requesting the cessation of dues
deductions from her wages.  Id. ¶ 115.  The Police Bureau and
the Union complied with Dumont's request, resulting in the
cessation of dues deductions from her wages.  Id. ¶ 116.  As
soon as Dumont's dues deductions ceased, the Police Bureau
reduced the amount of the employer health insurance contribution
by $25 a month.  Id. ¶ 117.  To this day, Dumont receives the
base employer contribution of $100 per month instead of the $125
she received before her disaffiliation was processed.  Id. ¶
118.

On August 11, 2023, there was a power outage at Dumont's workplace that lasted four hours, which meant the Police Headquarters was without air conditioning.  Id. ¶ 119.  Dumont's supervisor, Castro, told Dumont to take her laptop computer and work from home.  Id. ¶ 120.  Castro allowed the employees who were affiliated with the Union to take the day off with pay. Id. ¶ 121.

When Dumont learned that Union affiliated employees were not required to work from home and instead received a day off with pay, she requested the same treatment from Castro.  Id. ¶ 122.  Dumont's request was ultimately approved, after she had done work from home.  Id. ¶ 123.

Quiñones was an affiliate of the Union on June 27, 2018, when the Supreme Court issued its ruling in Janus.  Id. ¶ 124. As an affiliate of the Union and member of the bargaining unit exclusively represented by the Union, Quiñones received the additional $25 monthly employer contribution to help pay for health insurance costs.  Id. ¶ 125.

In July 2019, Quiñones communicated to the Police Bureau's Human Resources Office her desire to disaffiliate with the Union, submitting a disaffiliation form and requesting the cessation of dues deductions from her wages.  Id. ¶ 126.  The Puerto Rico Police Bureau and the Union complied with Quiñones' request, resulting in the cessation of dues deductions from her

wages.  Id. ¶ 127.  As soon as Quiñones' dues deductions ceased, the Police Bureau reduced her employer health insurance contribution by $25 a month.  Id. ¶ 128.  To this day, Quiñones receives the base employer contribution of $100 per month instead of the $125 she received before her disaffiliation was processed.  Id. ¶ 129.

Ortiz González was an affiliate of the Union on June 27, 2018, when the Supreme Court issued its ruling in Janus.  Id. ¶ 130.  As an affiliate of the Union and a member of the bargaining unit exclusively represented by the Union, Ortiz González received the additional $25 monthly employer contribution to help pay for health insurance costs.  Id. ¶ 131. On July 26, 2018, Ortiz González communicated to the Police Bureau's Human Resources Office her desire to disaffiliate with the Union, submitting a disaffiliation form and requesting the cessation of dues deductions from her wages.  Id. ¶ 132.

The Police Bureau and the Union complied with Ortiz González's request, resulting in the cessation of dues deductions from her wages.  Id. ¶ 133.  As soon as Ortiz González's dues deductions ceased, the Police Bureau reduced her employer health insurance contribution by $25 a month.  Id. ¶ 134.  To this day, Ortiz González receives the base employer contribution of $100 per month instead of the $125 she received before her disaffiliation was processed.  Id. ¶ 135.

[24]

Berlingeri was an affiliate of the Union on June 27, 2018, when the Supreme Court issued its ruling in Janus. Id. ¶ 136. As an affiliate of the Union and a member of the bargaining unit exclusively represented by the Union, Berlingeri received the additional $25 monthly employer contribution to help pay for health insurance costs. Id. ¶ 137. On October 6, 2021, Berlingeri communicated to the Puerto Rico Police Bureau's Human Resources Office her desire to disaffiliate with the Union, submitting a disaffiliation form and requesting the cessation of dues deductions from her wages. Id. ¶ 259. The Police Bureau and the Union complied with Berlingeri's request, resulting in the cessation of dues deductions from her wages. Id. ¶ 138. As soon as Berlingeri's dues deductions ceased, the Police Bureau reduced her employer health insurance contribution by $25 a month. Id. ¶ 139. To this day, Berlingeri receives the base employer contribution of $100 per month instead of the $125 she received before her disaffiliation was processed. Id. ¶ 140.

Ortiz Rivera was an affiliate of the Union on June 27, 2018, when the Supreme Court issued its ruling in Janus. Id. ¶ 141. As an affiliate of the Union and a member of the bargaining unit exclusively represented by the Union, Ortiz Rivera received the additional $25 monthly employer contribution to help pay for health insurance costs. Id. ¶ 141.

On October 6, 2021, Ortiz Rivera communicated to the Police Bureau's Human Resources Office her desire to disaffiliate with the Union, submitting a disaffiliation form and requesting the cessation of dues deductions from her wages. Id. ¶ 142. The Police Bureau and the Union complied with Ortiz Rivera's request, resulting in the cessation of dues deductions from her wages. ID. ¶ 143. As soon as Ortiz Rivera's dues deductions ceased, the Police Bureau reduced her employer health insurance contribution by $25 a month. Id. ¶ 144. To this day, Ortiz Rivera receives the base employer contribution of $100 per month instead of the $125 she received before her disaffiliation was processed. Id. ¶ 145.

Cruz was an affiliate of the Union on June 27, 2018, when the Supreme Court issued its ruling in Janus. Id. ¶ 146. As an affiliate of the Union and a member of the bargaining unit exclusively represented by the Union, Cruz received the additional $25 monthly employer contribution to help pay for health insurance costs. Id. ¶ 147. On September 30, 2021, Cruz communicated to the Police Bureau's Human Resources Office her desire to disaffiliate with the Union, submitting a disaffiliation form and requesting the cessation of dues deductions from her wages. Id. ¶ 148. The Police Bureau and the Union complied with Cruz's request, resulting in the cessation of dues deductions from her wages. Id. ¶ 149. As

[26]

soon as Cruz's dues deductions ceased, the Police Bureau reduced her employer health insurance contribution by $25 a month.  Id. ¶ 150.  To this day, Cruz receives the base employer contribution of $100 per month instead of the $125 she received before her disaffiliation was processed.  Id. ¶ 151.

Torres adjusted the monthly employer contributions for Police Bureau employees Madeline Calderon Colón ("Calderon Colón") and Colón from $125 to $100 solely because of their decision to disaffiliate from the Union.  Id. ¶ 154.

Moure does not know of any union nonaffiliates who are receiving the $25 additional employer contribution.  Id. ¶ 155. Moure learned of the unequal treatment when several employees were saying "you lost that benefit of the $25.00" around the time the Puerto Rico Police Bureau gave its employees the option to decline union affiliation.  Id. ¶ 156.  Moure concluded that the additional employer contribution of $25 per month was an exclusive benefit reserved for union members.  Id. ¶ 157. Méndez has never told López that the Puerto Rico Police Bureau is violating the terms of the collective bargaining agreement by failing to award all bargaining unit members the contractually mandated employer health insurance contribution amount of $125. Id. ¶ 158.

Cruz's paystub for the period beginning October 1, 2021, shows a $62.50 employer contribution, totaling $125 per month.

[27]

Id. ¶ 159.  The Puerto Rico Police Bureau's Human Resources
Office stamped as received Cruz's union disaffiliation form on
October 5, 2021.  Id. ¶ 160.  Cruz's paystub for the period
beginning October 16, 2021, shows a $50 employer contribution,
totaling $100 per month.  Id. ¶ 161.  Cruz's employer
contribution decreased from $125 to $100 per month as a result
of submitting a union disaffiliation form.  Id. ¶ 162.

Moure considers denying benefits to union non-members based
on the decision to disaffiliate to be an act of reprisal.  Id. ¶
163.  Denying benefits to employees because they dropped their
union membership is considered worse treatment than the one
union members receive.  Id. ¶ 164.

Ortiz Rivera's paystub for the period beginning August 16,
2021, shows a $62.50 employer contribution, totaling $125 per
month.  Id. ¶ 165.   The Puerto Rico Police Bureau's Human
Resources Office stamped as received Merab Ortiz Rivera's union
disaffiliation form on October 8, 2021.  Id. ¶ 166.  Ortiz
Rivera's paystub for the period beginning December 1, 2021,
shows a $50 employer contribution, totaling $100 per month.  Id.
¶ 167.  Ortiz Rivera's employer contribution decreased from $125
to $100 per month as a result of submitting a union
disaffiliation form.  Id. ¶ 168.

Ortiz González's paystub for the period beginning July 1,
2018, shows a $62.50 employer contribution, totaling $125 per

month.  Id. ¶ 169.  The Puerto Rico Police Bureau's Human
Resources Office stamped as received Ortiz González's union
disaffiliation form on July 17, 2018.  Id. ¶ 170.  Ortiz
González's paystub for the period beginning August 25, 2018,
shows a $50 employer contribution, totaling $100 per month.  Id.
¶ 171.  Ortiz González's employer contribution decreased from
$125 to $100 per month as a result of submitting a union
disaffiliation form.  Id. ¶ 172.

Whatts's paystub for the period beginning July 15, 2018,
shows a $62.50 employer contribution, totaling $125 per month.
Id. ¶ 173.  The Puerto Rico Police Bureau's Human Resources
Office stamped as received Whatts's union disaffiliation form on
July 18, 2018.  Id. ¶ 174.  Whatts's paystub for the period
beginning August 15, 2018, shows a $50 employer contribution,
totaling $100 per month.  Id. ¶ 175.  Whatts's employer
contribution decreased from $125 to $100 per month as a result
of submitting a union disaffiliation form.  Id. ¶ 176.
Carbonell's paystub for the period beginning July 15, 2018 shows
a $62.50 employer contribution, totaling $125 per month.  Id. ¶
177.  The Puerto Rico Police Bureau's Human Resources Office
stamped as received Carbonell's union disaffiliation form on
July 18, 2018.  Id. ¶ 178.  Carbonell's paystub for the period
beginning August 15, 2018, shows a $50 employer contribution,
totaling $100 per month.  Id. ¶ 179.  Carbonell's employer

[29]

contribution decreased from $125 to $100 per month solely as a result of submitting a union disaffiliation form.  Id. ¶ 180.

Berlingeri's paystub for the period beginning September 16, 2021, shows a $62.50 employer contribution, totaling $125 per month.  Id. ¶ 181.  Berlingeri's union disaffiliation form is dated October 6, 2021.  Id. ¶ 182.  Berlingeri's paystub for the period beginning October 16, 2021, shows a $50 employer contribution, totaling $100 per month.  Id. ¶ 183.  Berlingeri's employer contribution decreased from $125 to $100 per month solely as a result of submitting a union disaffiliation form.  Id. ¶ 184.

Nieves Hernandez's paystub for the period beginning July 31, 2018, shows a $62.50 employer contribution, totaling $125 per month.  Id. ¶ 185.  Nieves Hernandez's paystub for the period beginning August 15, 2018, shows a $50 employer contribution, totaling $100 per month.  Id. ¶ 186.  Nieves Hernandez's employer contribution decreased from $125 to $100 per month as a result of declining union affiliation.  Id. ¶ 187.

Colón's paystub for the period beginning December 16, 2020, shows an employer contribution of $125 per month.  Id. ¶ 188.  Colón's paystub for the period beginning December 16, 2021, shows an employer contribution of $100 per month.  Id. ¶ 189.  Colón's employer contribution decreased from $125 to $100 per

month as a result of submitting a union disaffiliation form.
Id. ¶ 190.

Quiñones's paystub for the period beginning March 16, 2018,
shows a $62.50 employer contribution, totaling $125 per month.
Id. ¶ 260.  Quiñones's paystub for the period beginning October
16, 2020, shows an employer contribution of $100 per month.  Id.
¶ 261.

In sum, the Police Bureau employees that pay union dues
receive the full $125 monthly employer contribution for health
insurance.  Id. ¶ 152.  The Police Bureau employees that pay no
union dues only receive the $100 monthly employer contribution
for health insurance.  Id. ¶ 153.

C.   **The Puerto Rico Police Bureau Has Done Nothing to End
     its Treatment of Plaintiffs And Employees Unaffiliated
     with the Union.**

Mulero and Moure discussed the allegations in the Amended
Complaint after Moure was appointed Human Resources director of
the Puerto Rico Police Bureau.  Id. ¶ 191.  The Puerto Rico
Police Bureau's Labor Relations Director, Brian P. Deese Cortes
("Deese"), who was among the email's recipients, came to
Mulero's office after receiving Carbonell's March 31, 2022,
email.  Id. ¶ 192.  Deese told Mulero that he would be looking
into Carbonell's allegations.  Id. ¶ 193.  Mulero did not follow
up with the Deese after the two spoke about the contents of
Carbonell's March 31, 2022, email.  Id. ¶ 194.  Mulero did not

speak with anyone else about Carbonell's March 31, 2022, email. Id. ¶ 195.

Once a disaffiliation form is entered into the payroll system, the $25 monthly additional employer contribution is eliminated for the disaffiliating employee. Id. ¶ 196. Mulero is not aware of any plans to put an end to the payroll system's reduction in the employer health insurance contribution for disaffiliating employees. Id. ¶ 197. Some employees brought to Torres' attention that they were not receiving the additional $25 employer contribution for health insurance. Id. ¶ 198. Torres estimates about ten employees brought the issue of a reduced employer health insurance contribution to her attention. Id. ¶ 199. Torres testified that upon undertaking an investigation of employee concerns, Torres decided the employees were receiving the correct amounts. Id. ¶ 200. Employees brought to Torres' attention that they were not receiving $25 per month towards health insurance contributions via email. Id. ¶ 201.

Torres testified that the employees eligible for the extra $25 are the employees who are members of the union and who belong to the bargaining unit. Id. ¶ 202. Carbonell complained to Torres about the reduced contribution. Id. ¶ 203.

Whatts complained to Torres about the reduced contribution. Id. ¶ 204. Carbonell complained to Nieves Fuentes about not her

not receiving the additional $25 monthly employer contribution.
Id. ¶ 205.

### D. The Union's Involvement in the Puerto Rico Police Bureau's Discriminatory Conduct

Méndez informs the Puerto Rico Police Bureau's new civilian hires of the benefits of joining the Union at the new employees' place of work. Id. ¶ 206. Méndez meets with employees and mentions the total employer health insurance contribution of $125 per month as a perk of membership in the Union. Id. ¶ 207. Méndez understands that civilian employees who are Union affiliates receive the additional employer health insurance contribution of $25 per month. Id. ¶ 208. Méndez understands that employees get the additional employer contribution of $25 per month by joining the Union. Id. ¶ 209.

Méndez understands that unaffiliated employees receive an employer health insurance contribution of only $100 per month. Id. ¶ 210. Méndez understands that the reason affiliates of the Union receive a total employer health insurance contribution of $125 per month as opposed to $100 is due to their affiliation with the Union. Id. ¶ 211. Méndez is aware that bargaining unit members stopped receiving the additional employer health insurance contribution of $25 once they disaffiliated from the Union. Id. ¶ 212.

The Union manages a Facebook page that publishes posts on Union issues and the benefits employees can acquire for joining. Id. ¶ 213. A Facebook post attributed to the Union lists the additional employer contribution of $25 per month as a perk of membership. Id. ¶ 214. While Méndez denied the Union's authorship of the Facebook post, he confirmed the post's accuracy regarding the post's identification of the $25 monthly additional employer contribution as a benefit of Union affiliation. Id. ¶ 215.

Méndez acknowledges that the Union is doing its part in enforcing and honoring the policy of awarding the additional employer contribution of $25 per month only to affiliates of the Union. Id. ¶ 216. The Department of Public Safety shares policy changes involving unions with the relevant unions before those changes go into effect. Id. ¶ 217. Méndez spoke with Sánchez when she was the Puerto Rico Police Bureau Human Resources Manager at least 5 or 6 times in her office. Id. ¶ 218.

Méndez also spoke with Sánchez when she was the Puerto Rico Police Bureau Human Resources Manager several times over the phone. Id. ¶ 219. Mendez had a meeting with Police Commissioner Henry Escalera, Associate Superintendent Alba Maldonado, and Sánchez sometime in 2019 to discuss various concerns of the Union. Id. ¶ 220.

**E.    Other Ways the Puerto Rico Police Bureau Encourages Unaffiliated Civilian Employees to Affiliate with the Union**

Air conditioning outages are a recurring issue in the Puerto Rico Police Bureau's office building.  Id. ¶ 221.  Union affiliates are permitted to leave work in cases of water, power, or air conditioning outages.  Id. ¶ 222.  Union affiliates are permitted to leave work after 4 hours of an air conditioning outage while non-affiliates are not.  Id. ¶ 223.  The Commissioner makes the decision to let employees leave work in cases of air conditioning outages.  Id. ¶ 224.

Upon notifying their supervisor, affiliates of the Union can take the rest of the day off without using leave in cases of an air conditioning outage lasting four hours.  Id. ¶ 225.  The ability for Union non-affiliates to leave work in cases of air conditioning outages without using leave is at the discretion of their supervisor.  Id. ¶ 226.  The Union only represents affiliates in grievance proceedings.  Id. ¶ 227.  A non-affiliated employee would need to join the Union if they want the Union's representation in a grievance proceeding.  Id. ¶ 228.

A Facebook post attributed to the Union lists the ability to leave work after a power or air conditioning outage of four hours as a perk of membership.  Id. ¶ 229.  While Méndez denied the Union's authorship for the Facebook post, he confirmed its

accuracy in naming leaving work after a power or air
conditioning outage of four hours as a benefit of Union
membership.  Id. ¶ 230.

Castro supervises Dumont.  Id. ¶ 231.  On August 11, 2023,
there was an outage of electricity and air conditioning.  Id. ¶
232.  The Puerto Rico Police Commissioner that day issued a
directive ordering supervisors to take any possible remedial
actions, including the use of fans, and relocating employees to
other air-conditioned areas.  Id. ¶ 233.  Should all remedial
actions be exhausted, López ordered that those employees
belonging to the appropriate unit be sent home.  Id. ¶ 234.  On
August 11, 2023, Castro allowed union affiliates to leave work
early with pay and without the need to take their laptops with
them to work from home.  Id. ¶ 235.  On August 11, 2023, Castro
allowed non-members of the Union to leave work early but
required them to keep working from home with their laptops.  Id.
¶ 236.

Dumont was among the non-affiliated employees Castro
allowed to leave work early to work from her home with her
laptop.  Id. ¶ 237.  Upon realizing only union members were
allowed to go home early without the need to keep working
remotely, Dumont filled out a form requesting the bargained-for
benefits of Article 81 of the collective bargaining agreement.
Id. ¶ 238.

After consulting Moure, Castro signed Dumont's form.  Id. ¶
239.  Castro did not inform any other Union non-members of their
right to take the rest of the day off without the need to
continue working remotely.  Id. ¶ 240.  The reason Castro did
not allow Union non-members to take the rest of the day off
without the need to continue working remotely was solely because
of their status as non-affiliates.  Id. ¶ 241.

### F. The Puerto Rico Police Bureau Has No Plans to Cease the Conduct Relating to its Unaffiliated Civilian Employees to Encourage Affiliation with the Union.

Sánchez is unaware of any investigations into alleged
reprisals for union disaffiliation.  Id. ¶ 242.  Torres is not
aware of any investigations into retaliation.  Id. ¶ 243.  Moure
did not consider it odd for union non-members to receive a
reduced employer contribution because she thought it was legal.
Id. ¶ 244.  Moure does not know of any steps that have been
taken to fix the unequal treatment of civilian employees
regarding the denial of the additional employer contribution
based on union membership status.  Id. ¶ 245.

Moure has not taken any steps to make sure that there are
no reprisals for people deciding to drop their membership in the
Union.  Id. ¶ 246.  The policies regarding the treatment of
employees come from the Commissioner of the Puerto Rico Police
Bureau.  Id. ¶ 247.

During an in-person conversation with López, Mulero raised the topic of civilian employees receiving a reduced amount of employer contribution.  Id. ¶ 248.  López was "concerned" with the notion of unaffiliated civilian employees receiving a reduced amount of employer contribution.  Id. ¶ 249.

López told Mulero "to look at everything having to do with the situation" of unaffiliated civilian employees receiving a reduced amount of employer contribution and "to look and see if there are alternatives."  Id. ¶ 250.  López has not followed up with Mulero nor has he had any further conversations with her about the topic of civilian employees receiving a reduced employer contribution.  Id. ¶ 251.

López is not aware of any investigations into the unequal treatment of employees that have submitted disaffiliation forms. Id. ¶ 252.  Mulero states that Commissioner López has no authority to take any action to remedy the reduced employer contribution unaffiliated civilian employees receive because he does "not manage the budget."  Id. ¶ 253.  Despite the Commissioner's inability to remedy the unequal treatment regarding employer contribution amounts, he can recommend remedial action to the Secretary of the Department of Public Safety.  Id. ¶ 254.

Mulero did not advise Commissioner López to recommend any remedial action to the Secretary of the Department of Public

Safety.  ID. ¶ 255.  When payroll officers receive a
disaffiliation form, they cancel the union dues deductions.  Id.
¶ 256.  Sánchez considered her work complying with Janus to be a
very minor project.  Id. ¶ 257.

## IV.  ANALYSIS

The cross motions for summary judgment argue flip sides of
the same coin:  The Employees argue that the nonpayment of a $25
supplemental health benefit to disaffiliating members of the
Union is unconstitutional retaliation and discrimination that
violates their right to non-association under the First
Amendment.  The Public Employer argues the opposite.  The
Employees' arguments are persuasive and determinative here.  On
the undisputed facts, after Janus permitted disaffiliation and
non-association with a public sector union, the Employees
disassociated and the Public Employer discontinued a $25 benefit
as to the Employees.  On the undisputed facts, it is
unconstitutional for the Public Employer to withhold a
collectively-bargained-for benefit from Employees either in
retaliation solely for disassociation or based upon union
membership status.

### A. Motion For Summary Judgment Standard

"Summary judgment is appropriate only if there is no
genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law."  Gattineri v. Wynn MA,

[39]

LLC, 93 F.4th 505, 509 (1st Cir. 2024) (citations and quotations omitted).  "The summary judgment ritual is standard fare: once the movant "adumbrate[s] 'an absence of evidence to support the nonmoving party's case,' . . .  the burden shifts to the nonmovant to establish the existence of a genuine issue of material fact."  Boykin v. Genzyme Therapeutic Products, LP, 93 F.4th 56, 60 (1st Cir. 2024) (quoting Brennan v. Hendrigan, 888 F.2d 189, 191 (1st Cir. 1989) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986))).  "To carry this burden, the nonmovant cannot simply rely on evidence that is 'conjectural or problematic,' . . . but, rather, 'must present definite, competent evidence.'"  Id. (citation omitted).  The above standard applies where the non-moving party bears the burden.

As this Court has written, the standard for a moving party that also bears the burden of proof at trial is something more:

> When the moving party also bears the burden at trial, as is the case here, its burden of proof includes "producing incontrovertible prima facie evidence of its claims."  Atlantic Specialty Insurance Co. v. Karl's Boat Shop, Inc., 480 F.Supp.3d 322[, 329] (D. Mass. 2020) (citing Celotex Corp., 477 U.S. 317 at 331).  If the movant does so, then the nonmovant must set forth specific facts sufficient to establish a genuine issue for trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

Securities & Exch. Comm'n v. Sharp, 692 F. Supp. 3d 9, 10-11 (D. Mass. 2023).  In all cases, the Court draws all reasonable inferences in favor of the non-moving party.  See Lech v. von

Goeler, 92 F.4th 56, 64 (1st Cir. 2024); Hamdallah v. CPC

Carolina PR, LLC, 91 F.4th 1, 8 n.1 (1st Cir. 2024).  The

parties do not dispute any material facts on the Employees'

Motion for Summary Judgment.

"Cross-motions for summary judgment require the district

court to 'consider each motion separately, drawing all

inferences in favor of each non-moving party in turn.'"  AJC

Int'l, Inc. v. Triple-S Propiedad, 790 F.3d 1, 3 (1st Cir. 2015)

(quoting D & H Therapy Assocs., LLC v. Boston Mut. Life Ins.

Co., 640 F.3d 27, 34 (1st Cir. 2011)).  Indeed, "[i]t is settled

law that each cross-motion for summary judgment must be decided

on its own merits."  Puerto Rico Am. Ins. Co. v. Rivera-Vazquez,

603 F.3d 125, 133 (1st Cir. 2010).  Of course, "[t]hat does not

mean . . . that each motion must be considered in a vacuum";

however, this Court "ordinarily should consider the two motions

at the same time."  Id.  Accordingly, this Court resolves the

cross-motions for summary judgment as matter of law under the

appropriate standard above.

### B. The Janus Decision and the First Amendment Right of Non-Association

In 2018, the Supreme Court decided Janus v. American

Federation of State, County, & Municipal Employees, Council 31,

585 U.S. 878 (2018).  "There, the [Supreme] Court overruled its

decades-old decision in Abood v. Detroit Board of Education, 431

U.S. 209 (1977), and held that such 'agency fee' arrangements violate the First Amendment of the United States Constitution by compelling the speech and association of non-union governmental employees." Doughty v. State Emps.' Ass'n of New Hampshire, SEIU Loc. 1984, CTW, CLC, 981 F.3d 128, 130 (1st Cir. 2020), cert. denied, 141 S. Ct. 2760 (2021).

As the Public Employer points out, Opp'n 5-8; Reply 4-5, the actual holding in Janus, while significant, is narrow: "States and public-sector unions may no longer extract agency fees from nonconsenting employees . . . Neither an agency fee nor any other payment to the union may be deducted from a nonmember's wages, nor may any other attempt be made to collect such a payment, unless the employee affirmatively consents to pay." Janus, 585 U.S. at 929-30; see Cotto López v. Unión de Trabajadores de la Industria Eléctrica y Riego, 392 F. Supp. 3d 263, 276 (D.P.R. 2019) ("The Janus decision overruled Abood only on the . . .[one]. . . point: today, states may not require public employees to pay any union fees to keep their jobs.").

The Supreme Court reaffirmed its understanding of the basic right to non-association which bears repeating here, as it speaks directly upon the issues concerning the allegations of the Amended Complaint. Justice Alito, writing for the majority, wrote:

The First Amendment, made applicable to the States by the Fourteenth Amendment, forbids abridgment of the freedom of speech. **We have held time and again that freedom of speech "includes both the right to speak freely and the right to refrain from speaking at all."** Wooley v. Maynard, 430 U.S. 705, 714 (1977); see Riley v. National Federation of Blind of N. C., Inc., 487 U.S. 781, 796-797(1988); Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 559 (1985); Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 256-257 (1974); accord, Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal., 475 U.S. 1, 9 (1986) (plurality opinion). **The right to eschew association for expressive purposes is likewise protected.** Roberts v. United States Jaycees, 468 U.S. 609, 623 (1984) ("Freedom of association ... plainly presupposes a freedom not to associate"); see Pacific Gas & Elec., supra, at 12 ("[F]orced associations that burden protected speech are impermissible"). **As Justice Jackson memorably put it: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."** West Virginia Bd. of Ed. v. Barnette, 319 U.S. 624, 642 (1943) (emphasis added).

**Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned.**

Janus, 585 U.S. 138 at 892 (emphasis added, parallel citations omitted).

The Janus Court recognized that most of its precedent concerned what could be restricted as opposed to compelled. Id. The Janus decision makes clear that even the government's requiring financial subsidization of speech is equally implicative of First Amendment concerns:

Free speech serves many ends. It is essential to our democratic form of government, see, e.g., Garrison v. Louisiana, 379 U.S. 64, 74-75 (1964), and it furthers the search for truth, see, e.g., Thornhill v. Alabama, 310 U.S. 88, 95 (1940). Whenever the Federal Government or a State prevents individuals from saying what they think on important matters or compels them to voice ideas with which they disagree, it undermines these ends.

**When speech is compelled, however, additional damage is done. In that situation, individuals are coerced into betraying their convictions. Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning, and for this reason, one of our landmark free speech cases said that a law commanding "involuntary affirmation" of objected-to beliefs would require "even more immediate and urgent grounds" than a law demanding silence…**

Compelling a person to subsidize the speech of other private speakers raises similar First Amendment concerns. Knox, supra, at 309; United States v. United Foods, Inc., 533 U.S. 405, 410 (2001); Abood, supra, at 222, 234-235. As Jefferson famously put it, "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves and abhor[s] is sinful and tyrannical." A Bill for Establishing Religious Freedom, in 2 Papers of Thomas Jefferson 545 (J. Boyd ed. 1950) (emphasis deleted and footnote omitted); see also Hudson, 475 U.S., at 305, n.15. **We have therefore recognized that a "'significant impingement on First Amendment rights'" occurs when public employees are required to provide financial support for a union that "takes many positions during collective bargaining that have powerful political and civic consequences."** Knox, supra, at 310-311 (quoting Ellis v. Railway Clerks, 466 U.S. 435, 455 (1984)).

Id. at 893 (emphasis added; parallel citations omitted). What this means is that the government cannot, through forced subsidization, require fee payments to the union under agency-shop arrangements. As the Janus Court explained

It is . . . not disputed that the State may require
that a union serve as exclusive bargaining agent for
its employees -- itself a significant impingement on
associational freedoms that would not be tolerated in
other contexts.  We simply draw the line at allowing
the government to go further still and require all
employees to support the union irrespective of whether
they share its views.

Janus, 585 U.S. at 916.

Justice Kagan's dissent, joined by Justice Ginsberg,

identifies the obvious Union-busting implications, see id. at

931 (Kagan, J., concurring), and unintended labor disturbance

that prior precedent had preserved for four decades:

And maybe most alarming, the majority has chosen
the winners by turning the First Amendment into a
sword, and using it against workaday economic and
regulatory policy.  Today is not the first time the
Court has wielded the First Amendment in such an
aggressive way.  See, e.g., National Institute of
Family and Life Advocates v. Becerra, ante, p. ----, -
-- U.S. ----, 138 S.Ct. 2361, 2018 WL 3116336 (2018)
(invalidating a law requiring medical and counseling
facilities to provide relevant information to users);
Sorrell v. IMS Health Inc., 564 U.S. 552 (2011)
(striking down a law that restricted pharmacies from
selling various data).  And it threatens not to be the
last.  **Speech is everywhere -- a part of every human
activity (employment, health care, securities trading,
you name it).  For that reason, almost all economic
and regulatory policy affects or touches speech.  So
the majority's road runs long.  And at every stop are
black-robed rulers overriding citizens' choices.  The
First Amendment was meant for better things.  It was
meant not to undermine but to protect democratic
governance -- including over the role of public-sector
unions.**

Id. at 956 (emphasis added, parallel citations omitted).  The

instant case is not union busting; rather, as more fully

described _infra_, it is just the opposite -- an example of a
Puerto Rico agency's attempt to preserve union membership by
unconstitutionally withholding a discretionary benefit as union
membership has apparently declined after _Janus_.

### C.    Section 1983 Claim - COUNT I[8]

The Employees argue that the policy of the Public Employer
to provide a benefit to union members while denying this same
benefit to disassociating Employees violates the First
Amendment.  The Public Employer argue that Employees fail to
state a claim as matter of law under _Janus_.

Section 1983 "allows individuals to sue certain persons for
depriving them of federally assured rights under color of state
law."  _Fincher_ v. _Town of Brookline_, 26 F.4th 479, 485 (1st Cir.
2022) (citation and quotation omitted).  "Section 1983 claims
require that a plaintiff establish three elements for liability
to ensue: [(1)] deprivation of a right, [(2)] a causal
connection between the actor and the deprivation, and [(3)]
state action."  _Diaz-Morales_ v. _Rubio-Paredes_, 170 F. Supp. 3d
276, 283 (D.P.R. 2016) (Perez-Gimenez, J.) (citing _Sanchez_ v.
_Pereira-Castillo_, 590 F.3d 31 (1st Cir. 2009); _accord_ _Cotto_
_Lopez_, 392 F. Supp. 3d at 273.

---

[8] There is only a single count in the Amended Complaint.
While the Complaint cites to the First and Fourteenth
Amendments, the single count alleges only a First Amendment
claim.

[46]

The Employees' Section 1983 claim is premised on a violation of their associational rights under the First Amendment to be free from compulsion to join the Union by the <u>government</u> providing a $25 health benefit to Union members and withholding that benefit from non-members since <u>Janus</u>.

Under P.R. Laws Ann. tit. 3, § 729h, the Employees are entitled to "no[] . . . less than . . . one hundred ($100) monthly" for a public employer contribution for health benefits.[9] Prior to the Supreme Court's ruling in <u>Janus</u>, the Public Employer provided an additional employer contribution of $25 per month to help pay for health insurance costs, totaling $125 per month, to all employees.  These benefits are completely funded by the public fisc.  Specifically, the funding source for these two amounts is the Commonwealth of Puerto Rico's "General Budget

---

[9] The statute, titled the "Public Employees Health Benefits Act-Contributions[,]" provides in pertinent part:

> (a) The Government employer contribution for health benefits for employees covered by health benefit plans under §§ 729a-729n of this title shall be fixed in the General Budget of Expenses and shall not be less than five dollars ($5) monthly in the case of the municipalities nor one hundred dollars ($100) monthly for the employees of rest of the Government dependencies, and one hundred dollars ($100) for the pensioners of the Employees Retirement System of the Commonwealth of Puerto Rico and the pensioners of the Teachers of Puerto Rico Retirement System, but shall not exceed the total amount of the corresponding fee to be paid to any employee.

P.R. Laws Ann. tit. 3, § 729h.

of Expenses[.]"   P.R. Laws Ann. tit. 3, § 729h.   After <u>Janus</u>, Employees disaffiliated and declined to pay dues.   The Police Bureau was notified by the Union and the $25.00 supplement was discontinued to the Employees.

As the Supreme Court observed in <u>Janus</u>, it is settled that "[t]he union may not negotiate a collective-bargaining agreement that discriminates against nonmembers, . . . **[and] it is questionable whether the Constitution would permit a public-sector employer to adopt a collective-bargaining agreement that discriminates against nonmembers.**"   585 U.S. at 899 (emphasis added).   Indeed, "[p]rotection of [non-union members'] interests [are] placed in the hands of the union, and if the union were free to disregard or even work against those interests, these employees would be wholly unprotected."   <u>Id.</u> at 901.   Here, the public sector employer and the Union are acting under the CBA in the exact manner that the <u>Janus</u> court deemed questionable.   This Court agrees with the Supreme Court's intuition, and rules that the Constitution does not permit a public-employer to adopt a CBA –- or later interpret it –- in a manner that discriminates against non-members.

The Employees have established that the Police Bureau's action is First Amendment retaliation and discrimination for disassociation with, and non-support of, the Union.   They cite to <u>Brannian</u> v. <u>City of San Diego</u>, 364 F. Supp. 2d 1187 (S.D. Cal

2005), which is persuasive.  Employees' Mem. 13.  In that case, the public employer provided a lump sum to its public employees to spend on insurance options and programs.  Id. at 1189.  The union and the public employer barred the non-union employees from enrolling in optional dental and vision plans with their left over funds but allowed union members to enroll in these optional programs.  Id. at 1189-90.  That court ruled that the public employer and union violated the non-union members' First Amendment rights by restricting access to the optional plans to union members.  See Brannian, 364 F. Supp. 2d at 1195 ("Discriminatory conduct, such as that practiced here [where only union members received retroactive wages and vacation benefits], is inherently conducive to increased union membership.  In this respect, there can be little doubt that it 'encourages' union membership, by increasing the number of public employees who would like to join and/or their quantum of desire." (citation omitted)).[10]

The Public Employer avoids discussion of Brannian and characterizes the Employees' claim as an expanded "Janus"

_____

[10] The Employees explore the appropriate level of scrutiny in their brief, a point to which the Public Officials do not respond.  Employees' Mem. 15-16 (citing Janus, 585 U.S. at 924-925).  Reviewing the undisputed facts, there is no need to analyze the issue here because the Public Employer gives no reason at all.

[49]

claim.[11]  Opp'n 5-6.  Janus holds that unions cannot compel

speech through subsidy.  It is the Public Employer's response

and on-going actions to the exercise of the Employees' rights

that is the problem, not the contours of the First Amendment

associational rights established in Janus.  Indeed, all of the

cases cited by the Public Employer are factually inapposite.

Rather, for the most part, the Public Employer's cited cases

primarily address delays in cessation of dues collection by

disassociating union members.  See Poyneer v. New York State

Unite Teachers, 5:22-cv-0261 (GTS/ML), 2024 WL 812831, at *1, 10

(N.D.N.Y. Feb. 27, 2024) (deductions of union dues); Belgau v.

Inslee, 975 F.3d. 940, 951-52 (9th Cir. 2020) (same); Bennett v.

Council 31 of Am. Fed'n of State, Cnty. & Municipal Emps., AFL-

CIO, 991 F.3d 724, 733 (7th Cir. 2021) (same); Ramos-Ramos v.

Haddock, No. CV 20-01232(GMM), 2023 WL 6318066 (D.P.R. Sept. 27,

---

[11] The parties do not contest that Section 1983 applies to
Puerto Rico as a state actor, and the First Circuit has long
treated Puerto Rico as a state for Eleventh Amendment sovereign
immunity purposes.  See Clemente Props., Inc. v. Pierluisi
Urrutia, 693 F. Supp. 3d 215, 234-36 (D.P.R. 2023) (Méndez-Miró,
J.); Financial Oversight & Mgmt. Bd. for P.R. v. Centro de
Periodismo Investigativo, Inc., 598 U.S. 339, 346 n. 2 (2023)
(assuming without deciding Puerto Rico is a State for Eleventh
Amendment purposes); see id. at 355 (Thomas, J., dissenting)
("Here, however, all sides agree that Puerto Rico is a
Territory, not a State. . .  Accordingly, it is difficult to see
how the same inherent sovereign immunity that the States enjoy
in federal court would apply to Puerto Rico.").  While the Court
follows the First Circuit and assumes that Puerto Rico is a
State for purposes of this action, the ultimate issue remains
undecided by the Supreme Court.

2023) (same); <u>Fultz</u> v. <u>AFSCME</u>, 549 F. Supp. 3d. 379 (M.D. Pa. 2021) (same); <u>Creed</u> v. <u>Alaska</u> <u>State Emps. Ass'n</u>, 472 F. Supp. 3d. 518 (D. Alaska 2020) (same); <u>Durst</u> v. <u>Oregon Educ. Ass'n</u>, 450 F. Supp. 3d 1085 (D. Or. 2020) (same); <u>Reisman</u> v. <u>Associated</u> <u>Facs. of Univ. of Me.</u>, 356 F. Supp. 3d 173 (D. Maine 2018).

In sum, on the undisputed facts, with all reasonable inferences drawn in favor of the Public Employer, after <u>Janus</u>, upon Employees' withdrawal of their membership or support of the Union, the Public Employer withheld $25.00 from the benefits paid by the Commonwealth of Puerto Rico based upon disassociation or membership status.  This is either retaliation for exercise of non-union members' post-<u>Janus</u> non-associational rights under the First Amendment under the Constitution or simply discrimination.  See <u>Brannian</u>, 364 F. Supp. 2d at 1195 (First Amendment violation for Union to permit flex spending dollars for dental benefits to union members and not to non-union members).  There is no basis on the record before this Court, compelling or otherwise, for the Public Employer to withhold $25.00 per month from non-union members.  Simply put, while the Union might be able to provide additional benefits to their members, the Public Employer cannot retaliate or discriminate against disassociating individuals by withholding $25 per month based upon union membership.  See <u>id.</u>; <u>Taft</u> v. <u>Whitney</u>, No. 22-CV-6279-FPG, 2024 WL 1533623, at *7-8 (W.D.N.Y.

Apr. 9, 2024) (Post-<u>Janus</u> First Amendment retaliation claim survived motion to dismiss as to individual defendants, but not municipality because no allegation of discriminatory policy).

Furthermore, lest there be any doubt, this Court rules as matter of law that where the Union is the exclusive bargaining agent on behalf of union members and non-union members alike, it is a First Amendment violation for the Public Employer to adopt a CBA –- or an interpretation of the CBA -- that discriminates against the disassociating or unaffiliated public employees by withholding a supplemental health benefit payment paid by the government solely based upon union membership status.

**V. CONCLUSION**

Public sector unions serve an important purpose acting as an exclusive bargaining agent on behalf of union members and non-union members alike with respect to wages and other benefits paid by public employers.  After <u>Janus</u>, a public sector union may exclusively represent union and non-union employees alike regardless of who is paying the dues (if anyone) to support that union.

This Court takes no position on the broad political questions raised by the structure of labor relations as between public employers and public employees.  It is clear to this Court that the Police Bureau and the Union are seeking to buoy the Union in part by claiming the $25.00 supplemental health

benefit -- paid by the Public Employer and the taxpayers of Puerto Rico -- is a benefit of union membership.  It is not. The Public Employer may neither retaliate for disassociation or non-support of the public sector union, nor can it adopt -- or as here interpret -- a CBA in a manner that permits discrimination against non-union members covered by that bargaining based solely upon union membership.  Accordingly, for the reasons stated above, the Court rules as follows.[12]

1.    The Employees' Motion For Summary Judgment, ECF No. 107, is <u>ALLOWED</u>, and judgment shall enter against the Defendants.  The Court <u>DECLARES</u> that the practice by the Public Employer of withholding a $25.00 supplemental health benefit from non-union members violates non-union members' non-associational First Amendment rights.

2.    Order of Permanent Injunction.  The Public Employer, its officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with them, are prospectively <u>ENJOINED</u> from withholding the $25.00 supplemental health benefit paid to Union members from non-union

---

[12] This Court is well aware that it has here addressed and resolved the merits without first addressing the class allegations.  <u>See</u> <u>Doe</u> v. <u>Gaughan</u>, 808 F.2d 871, 873 (1st Cir. 1986).  Since only prospective injunctive relief is sought here, the breath of appropriate injunctive relief obviates the need further to address this class issue.  Accordingly, the class certification motion, ECF No. 104, is now denied as moot.

members eligible to be part of the Union, based solely upon
union membership.

    3.    The Public Employers' Motion for Summary Judgment, ECF
No. 134, is <u>DENIED</u>.

    Judgment shall be enter is accordance with these rulings.

    **SO ORDERED.**

<u>/s/ William G. Young</u>
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[13]

---

[13] This is how my predecessor, Peleg Sprague (D. Mass 1841-
1865), would sign official documents.  Now that I'm a Senior
District Judge I adopt this format in honor of all the judicial
colleagues, state and federal, with whom I have had the
privilege to serve over the past 46 years.